UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

                                                                    DOCKET NO.5:08CR555(NAM)

vs.

BRIAN CLAY,

                Defendant.
_____

## SENTENCING MEMORANDUM

DATED:   May 5, 2009            Respectfully submitted,


                                          ALEXANDER BUNIN
                                          Federal Public Defender


                By:
                                          James F. Greenwald, Esq.
                                          Assistant Federal Public Defender
                                          Bar Roll No. 505652
                                          Clinton Exchange, 3rd Floor
                                          4 Clinton Square
                                          Syracuse, New York  13202
                                          (315) 701-0080

Defendant, Brian Clay, by and through his attorney, James F. Greenwald, Esq., Assistant Federal Public Defender, submits the following for consideration of the Court in connection with sentencing in the above entitled matter:

**CONTENTS OF PRESENTENCE INVESTIGATION REPORT**

The defense does not object to the Sentencing Guideline Calculation contained in the Pre-Sentence Report, however, the defense does object to the application of Sentencing Guidelines §2G2.2(b)(7), which imposes an increase in the Offense Level by reason of the number of images involved. For the reasons set forth below, a sentence substantially below the recommended Guideline Range would be appropriate in this case. A sentence at the minimum set by statute would be more than sufficient to satisfy the requirements of the Sentencing Reform Act.

**PERSONAL CHARACTERISTICS**

Brian Clay is a somewhat immature 24 year old man. Aside from a traffic charge, he has no prior contacts with the criminal justice system. Although he denies having been abused himself, he grew up in a household where his father was engaged in regularly molesting Brian's sisters from an early age. This experience may be the source of the morbid fascination that he developed for child pornography.

Although Brian dropped out of high school in the 11th grade, he completed his GED and had made arrangements to begin college at SUNY Morrisville. He was arrested for this offense by state authorities just as he was about to start classes. Brian hopes to continue his education while he is incarcerated and intends to study Business and Economics, and develop a business plan so that he can "hit the ground running" upon his release.

Before and since his arrest, Brian has been active in his local church. Leo Hafelin, the

Youth Director of Brian's church writes that Brian was the driving influence to bring his mother and sisters to church on Sundays. Jessica Hill is a long time friend of Brian's and she describes the many sports and community activities that Brian participated in during the years that she has known him. Jessica also describes Brian's problems with alcoholism, which were so severe that she believes "If you ask Brian if he remembers much of the past few years he probably would tell you 'Not really'." Tyler Edwards is a friend who met Brian while she attended Colgate University and she describes Brian as a talented self-learner, a person who involved himself in community fix-up projects in the Hamilton area. Brian also used his talents to help her edit a video project for a class she was taking. Letters are being provided to the Court and counsel under separate cover.

Brian has a history of problems with pain killers, to which he was habituated for a period after suffering accidental burns. He has a history of marijuana use and a major problem with alcohol. He should be afforded the opportunity to participate in Bureau of Prisons programming to address these problems while incarcerated.

## PROMULGATION OF THE SENTENCING ENHANCEMENT
## FOR NUMBER OF IMAGES IS UNCONSTITUTIONAL

In *United States v. Mistretta*, 488 U.S. 361 (1989), the Supreme Court granted certiorari to decide whether the Sentencing Guidelines promulgated by the newly formed Sentencing Commission were constitutional. *Id.*, 488 U.S. at 362. The *Mistretta* Court upheld those Guidelines based on its understanding of the way the Commission had produced, and would produce, Guidelines. *Id.* As explained below, the amount-of-images Guideline enhancement was promulgated in a manner completely at odds with that understanding, and is unconstitutional.

The *Mistretta* Court understood the Commission to be a "peculiar institution" because the Commission, as formed by the Sentencing Reform Act of 1984, is an "independent" and "expert" agency within the Judiciary that exercises "administrative powers" to create legislative-like rules to guide individual adjudications in the area of criminal sentencing an area that "has been and should remain 'primarily a judicial function." *Mistretta,* 488 U.S. at 368, 379, 384, 390, 404 (quoting legislative report). The defendant in *Mistretta* argued that this new type of judicial branch agency was unconstitutional under the non-delegation and separation of powers doctrines because it was both too independent of, and too subservient to, the political branches. *Id.* at 378, 383. The *Mistretta* Court saw the new agency differently, understanding the new agency to have both substantial congressional guidance and substantial discretion in its promulgation of Guidelines. *Id.,* 374-78, 393-94, 407-08. Thus, the Court basically held that the Sentencing Reform Act, when delineating the Commission's relationship with the political branches, had successfully navigated the Scylla and Charybdis of excessive independence and excessive subservience. *Id.*

Nonetheless, the *Mistretta* Court said it was "troubled" somewhat by the defendant's argument that "the Judiciary's entanglement in the political work of the Commission undermines public confidence in the disinterestedness of the Judicial Branch." *Id.* at 407. Because the Commission is a part of the Judiciary and is engaged in work that is "primarily a judicial function," *id.* at 390, the Judiciary's imprimatur of "impartiality and nonpartisanship" is stamped on each Guideline. *Id.* at 407. Indeed, the cover of the Guidelines Manual says the Guidelines are promulgated by the Commission an agency of the Judiciary. The *Mistretta* Court was "troubled" because, if the Guidelines are not in fact impartial and nonpartisan, the Judiciary would in fact be

promulgating the edicts of a political branch, and so its "integrity" would be "undermined." *Id.* at 404, 407.

The *Mistretta* Court allayed its own concern by reiterating its understanding of the nature of the Sentencing Commission and its work. The Court approved the Judiciary's entanglement in the Commission's somewhat political work because the Court believed the promulgation of the Guidelines would in fact be "essentially a *neutral* endeavor and one in which judicial participation is peculiarly appropriate." *Id.* at 407 (italics added). The *Mistretta* Court believed neutral, "judicial experience and expertise" would in fact "inform the promulgation" of Guidelines. *Id.* at 408. The Court believed this would be so because the Commission was created as "an independent agency in every relevant sense," was expressly charged with using sciences and expertise to develop, review and revise Guidelines, and was left with "significant discretion to determine which crimes have been punished too leniently, and which too severely." *Id.* at 374, 377, 393[1]. In sum, the *Mistretta* Court believed that the Judiciary could, without undermining its integrity, promulgate the Guidelines because those Guidelines would be the product of the independent exercise of expert and reasonable discretion.

When expressing these beliefs, the *Mistretta* Court also described an important boundary a limit to the Judiciary's permissible "entanglement" in "political work." *Id.* at 407. Setting that boundary, the Court reiterated that "[t]he legitimacy of the Judicial Branch ultimately depends on its reputation for impartiality and nonpartisanship." *Id.* at 407. And the Court concluded: "That

---

[1] In a similar vein, the Court observed that "[d]eveloping proportionate penalties for hundreds of different crimes by a virtually limitless array of offenders is precisely the sort of intricate, labor-intensive task for which delegation to an expert body is especially appropriate." *Id.* at 379.

reputation may not be borrowed by the political Branches to cloak their work in the neutral colors of judicial action." *Id.* The gist of that statement is clear. Since the Judiciary (in the form of its agency, the Sentencing Commission) is nominally the independent, expert, and neutral promulgator of the Guidelines, the Guidelines cannot be promulgated in fact by Congress. That is, to be constitutional, a Guideline must be promulgated by the Sentencing Commission exercising its delegated powers, not by Congress through direct legislation.

The amount-of-images enhancement was created by the Feeney Amendment. *United States v. Detwiler,* 338 F. Supp. 2d 1166, 1171 (D. Or. 2004); U.S.S.G. App. C, Amend. 649 (April 30, 2003). In 2003, the Feeney Amendment was "abruptly" added to an "unrelated but popular" bill shortly before consideration by the House of Representatives. *Detwiler,* 338 F. Supp. 2d at 1171. That Amendment included various directives concerning the Guidelines and the Commission. *Id.* With respect to the child-pornography Guideline, it also included an "unprecedented" type of legislation, namely, a "direct[]" amendment to the Guideline. *Id.* at 1171 & n.3. The directness of the amendment was unmistakable, reducing the Commission from its role as producer and "promulgat[or]" of Guidelines to the mere "distribut[or]" of Congressional edicts; in its final form, the relevant provision stated:

> SEC. 401. SENTENCING REFORM
>
> (I) SENTENCING GUIDELINE AMENDMENTS - (1) Subject to subsection (j), the Guidelines Manual *promulgated* by the Sentencing Commission pursuant to section 994(a) of title 28, United States Code, is amended as follows:
>
> (C) Section 2G2.2(b)[2] is amended by adding at the end the following:

---

[2] The amount-of-images Guideline is now located at U.S.S.G. § 2G2.2(b)(7) because the Commission rearranged some of the child-pornography Guidelines in 2004. U.S.S.G. App. C, Amend. 664 (Nov. 1, 2004).

"(6) If the offense involved— "(A) at least 10 images, but fewer than 150, increase by 2 levels;
"(B) at least by 150 images, but fewer than 300, increase by 3 levels;
"(C) at least 300 images, but fewer than 600, increase by 4 levels; and "(D) 600 or more images, increase by 5 levels.".

(j) CONFORMING AMENDMENTS.-
(1) Upon enactment of this Act, the Sentencing Commission shall forthwith *distribute* to all courts of the United States and to the United States Probation System the amendments made by subsections (b), (g), and (I) of this section to the sentencing guidelines ... . These amendments shall take effect upon the date of enactment of this Act, in accordance with paragraph *(5)*.

Pub. L. 108-21, Title V, § 401 (Apr. 30, 2003), 117 Stat. 650, 672-73 (italics added). *See* U.S.S.G. App. C, Amend. 649 (Apr. 30, 2003) (incorporating this amendment into Guidelines Manual).

Substantively, that amendment created a whole new criterion for punishing a child-pornography offender because it established, for the first time, an enhancement keyed to the amount of images possessed. That criterion made little sense as a substantive matter. "[M]ost images [of child pornography] are posted free on the Internet or are swapped for other images." Katherine S. Williams, *Child Pornography and Regulation of the Internet in the United Kingdom,* 41 Brandeis L.J. 463, 498 (Spring 2003). And, as Congress formally found in the Protect Act itself, "the production of child pornography is the byproduct of, and not the primary reason for, the sexual abuse of children." Pub. L. 108-2 1, Title V, § 501 (Apr. 30, 2003), 117 Stat. *650,* 678. Because child-pornography images are the by-product of abuse (and not vice versa), and because most of those images are available for free or trade, an on-line trader's acquisition of additional images typically does not substantially cause additional abuse and, consequently, does not justify a dramatic increase in punishment (e.g., here the enhancement

would increase the sentencing range from the mandatory minimum 60 months at the low end to as many as 121 months at the high end).

Regardless of the soundness of its substantive changes, the Feeney Amendment soon drew attention, after initial approval in both houses of Congress, for its controversial procedural aspects, such as directly amending the Guidelines. *Detwiler*, 338 F. Supp. 2d at 1171. Most significantly, Chief Justice Rehnquist, in his capacity as Chairman of the Judicial Conference, wrote to Congress "oppos[ing] legislation that directly amends the sentencing guidelines, and suggest[ing] that, in lieu of mandated amendments, Congress should instruct the Sentencing Commission to study suggested changes to particular guidelines and report to Congress if it determines not to make the recommended changes." 49 Cong. Rec. S5 113, S 5120. The Secretary of the Judicial Conference added that the Conference opposed "direct congressional amendment of the sentencing guidelines because such amendments undermine the basic premise in establishment of the Commission that an independent body of experts.. . is best suited to develop and refine sentencing guidelines." 149 Cong Rec. S5113, S5l2l. As Chief Justice Rehnquist explained, "this legislation, if enacted, would do serious harm to the basic structure of the sentencing guideline system." 49 Cong. Rec. SSll3, S5l20.

Congress nonetheless enacted the amount-of-images amendment as a direct amendment to the Guidelines (in the form quoted above). Because an administrative agency cannot rule a statutory provision unconstitutional, the Commission was absolutely required to incorporate and distribute Congress's amount-of-images enhancement into its Guidelines Manual. *See Pasha v.*

*Gonzales,* 433 F.3d 530, 536 (7th Cir. 2005).[3] Congress thereby directly and unilaterally legislated the five-level increase for offenders possessing 600 or more images. The end result is concretely this: although the cover of the Guidelines Manual says it is promulgated by the Sentencing Commission, the amount-of-images Guideline contained within that Manual has been, in fact, promulgated by Congress.

Congress crossed the separation-of-powers boundary identified by *Mistretta* because it has promulgated its legislation not in the United States Code but rather in the Guidelines Manual. By directly and unilaterally adding its amount-of-images enhancement to the Guidelines Manual, Congress has borrowed the Judiciary's reputation to "cloak" its political work "in the neutral colors of judicial action." *Mistretta,* 488 U.S. at 407. Consequently, this amount-of-images amendment is an "impermissabl[e] threat[] to the institutional integrity of the Judicial Branch." *Id.* at 383. And, as such, that portion of the Protect Act violates the separation of powers doctrine and is unconstitutional. *Id.* Accordingly, it mut be deemed invalid. *Stinston*, 508 U.S. at 38.

When portions of a statute are found to violate the separation of powers doctrine, "the invalid portions of a statute are to be severed unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not." *Immigration and Naturalization Service vs. Chadha*, 462 U.S. 919, 931-32 (1983). The amount-of-images enhancement precisely fits this profile of a severable provision. It is just one in a series of discrete and only partially related provisions. It can be invalidated without affecting any other provision of the Protect Act. Under *Chadha*, it is clearly severable and may be invalidated

---

[3]Moreover, it appears the amount-of-images must be, absent congressional action, *a permanent* amendment to the Guidelines since the Commission cannot amend a Guideline such that it conflicts with a statute. *LaBonte,* 520 U.S. at 757.

without addressing the constitutionality of the rest of the Protect Act.

Even if the Court deems it appropriate to apply any enhancement based upon the number of images that Brian received, there is no valid reason to determine that each video file is 75 times more onerous than a still image of the same material. Brian was found to have downloaded a total of 38 files. This should not result in a sentence equivalent to that recommended for an offender who possesses over 1,000 images.

## CONCLUSION

A sentence that does not exceed the statutory minimum is more than sufficient to comply with the directives of the Sentencing Reform Act. A Judicial Recommendation that Brian be permitted to participate in the Residential Drug Treatment Program while incarcerated would be appropriate.

DATED: May 5, 2009				ALEXANDER BUNIN
						Federal Public Defender


					By:	s/ JAMES F. GREENWALD
						Asst. Federal Public Defender
						Bar Roll No: 505652
						Clinton Exchange, 3rd Floor
						4 Clinton Street
						Syracuse, New York   13202
						(315) 701-0080

TO:	Lisa Fletcher, Esq., AUSA
	Janna Kulakowski, USPO